IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No.: 2:12-148 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| DESHAWN RIVERS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**Government's Response to Defendant's Motion to Reduce Sentence
Pursuant to 18 U.S.C. § 3582(c)(1)(A)**

Defendant Deshawn Rivers ("Defendant") has filed a motion asking this Court to reduce his sentence of imprisonment under 18 U.S.C. § 3582(c)(1)(A) and order his immediate release, relying on the false claim that he is no longer subject to the Armed Career Criminal Act ("ACCA"), as well as threats presented by the COVID-19 pandemic. The United States respectfully opposes the motion. The Court should deny the motion with prejudice because Defendant has not met his burden of establishing that a sentence reduction is warranted under the statute.

**Factual Background**

Defendant was indicted on February 15, 2012, being charged with two counts of possession of firearms by a prohibited person, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) and 924(e); and one count of possession with intent to distribute a quantity of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C). ECF No. 2. Defendant pled guilty to Count 1 of the Indictment on September 27, 2012. ECF No. 40. On July 18, 2013, Defendant was sentenced to 188 months imprisonment to be followed by five years supervised release. ECF Nos. 49, 51. His projected release date is June 4, 2025.

1

On August 4, 2020, Defendant filed his first motion for this Court to grant compassionate release via 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018. ECF No. 117. On December 17, 2020, the Court issued an Order denying Defendant's motion, finding that Defendant "failed to establish the basis for compassionate release.: ECF No. 139 at 3. On September 24, 2021, the Fourth Circuit affirmed the Court's order. *United States v. Rivers*, 859 Fed.Appx. 684 (Mem) (4th Cir. 2021).

Defendant filed a second motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) on October 7, 2021. For the reasons stated below, Defendant's motion should be denied.

I. **Defendant is Still Subject to the Armed Career Criminal Act.**

Defendant first makes the erroneous claim that he is no longer subject to the ACCA and under *United States v. McCoy*, 981 F.3d 271 (4th Cir. 2021), he is entitled to compassionate release. *McCoy* held that district judges are not limited to the factors contained in U.S.S.G. § 1B1.13 when considering compassionate release motions brought by inmates. Defendant relies on *United States v. Norman*, 935 F.3d 232 (4th Cir. 2019), to claim that he is no longer subject to the ACCA. In *Norman*, the Fourth Circuit held that a conviction under 21 U.S.C. § 846 (drug conspiracy) does not qualify as a "controlled substance offense under the United States Sentencing Guidelines. The Guidelines define a "controlled substance" as "an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense." U.S.S.G. § 4B1.2(b).

By contrast, the ACCA considers a "serious drug offense," defined as "an offense under the Controlled Substances Act (21 U.S.C. 801 et seq.), . . . for which a maximum term of imprisonment of ten years or more is prescribed by law . . ." 18 U.S.C. § 924(e)(2)(A)(i). Defendant's prior conviction under 21 U.S.C. § 846 falls squarely within that definition. Thus, he still falls under the ACCA and any reliance on *Norman* is misplaced. Because he would still be subject the same mandatory minimum sentence were he to be convicted today, the Court should not grant Defendant's motion for compassionate release based on an unrelated change in the law.

## II.     BOP's Response to the COVID-19 Pandemic

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

### A.  Modified Operations

From the moment the pandemic began, the Bureau of Prisons (BOP) made extensive changes to its operations, based on a plan that was prepared over many years and refined in early 2020 in consultation with the Centers for Disease Control and the World Health Organization. Those efforts continue.

The Government recognizes that the COVID-19 case rate at a particular institution may change at any time. It therefore focuses primarily on considerations specific to the defendant. But BOP's success at many institutions in limiting the spread of the virus, and in stemming outbreaks when they occur, provides an important backdrop for the defendant's motion.

BOP's "action plan" is described in detail at www.bop.gov/coronavirus/. As part of that plan, all newly arriving inmates are quarantined and not released into the general population until 14 days have passed and the inmate has tested negative; inmate movement within an institution is

3

restricted in order to promote social distancing; mask wearing by inmates and staff is required; all facility staff are screened for symptoms daily; social visiting has been suspended at nearly all institutions; and access by other outsiders is restricted to only those performing essential services, who are also screened before entry.

In addition, acting under the authority granted in the CARES Act, BOP has transferred many thousands of inmates to home confinement, focusing on nonviolent offenders who have served the majority of their sentences. This initiative, combined with the reduced number of new arrivals during the pandemic and the ordinary release of prisoners upon completion of their sentences, has led to a dramatic decrease in the total BOP population, which in turn has increased opportunities for social distancing and reduced the strain on BOP resources. The total BOP population is now over 10% less than it was at the outset of the pandemic, standing at the lowest level in decades.

When an outbreak does occur, any infected inmate is immediately quarantined, and all contacts (including entire housing units if warranted) are tested and quarantined as necessary, until all contacts return at least two negative tests in a two-week period.

All of these strenuous efforts have been fruitful. To be sure, there is no way to stop this virus short of widespread vaccination, and inmates inevitably will be infected and some may succumb, just as in the population at large. But the rate of deaths in federal prisons has been comparable to that in the general U.S. population, a notable achievement given the known risks of viral spread in a congregate prison setting.

As it specifically relates to the defendant, BOP's aggressive efforts have extended to FCI Bennettsville. At present, there are seven inmates who are reported positive and are isolated while they are treated and recover. There are also 155 current inmates who previously tested positive and

4

have recovered. There has been one COVID-related deaths at this institution. The latest statistics are available at www.bop.gov/coronavirus.

### B. COVID-19 Vaccinations

BOP worked with the CDC and the federal government's COVID-19 Vaccine/Therapeutics Operation (formerly known as Operation Warp Speed) to ensure that BOP received the COVID-19 vaccines as they became available, and then offered the vaccines to all willing staff members and inmates, beginning first with staff members (who present a more likely vector for COVID-19 transmission into an institution), and then offering the vaccines to inmates in order of priority of need in accordance with CDC guidelines. As one court observed, "Since the vaccines became available, the Bureau of Prisons diligently and efficiently administered the doses allocated to it, leading all jurisdictions and Federal entities in its vaccine utilization rate." *United States v. Roper*, 2021 WL 963583, at *3 (E.D. Pa. Mar. 15, 2021) (footnote omitted).

As of this writing, through an intensive effort over the past months, BOP has offered a vaccine to every inmate in BOP-managed institutions. BOP has administered a total of 241,125 doses to staff and inmates nationwide. *See* Federal Bureau of Prisons, "COVID-19 Coronavirus," www.bop.gov/coronavirus (accessed November 4, 2021). At FCI Bennettsville, where the defendant is held, BOP has fully vaccinated 160 staff members and 1,082 inmates. Going forward, BOP will continue to offer vaccines to newly arrived inmates, and to those inmates who initially declined a vaccine if they change their minds, as expeditiously as possible as supplies are available.

The clinical guidance provided to BOP health services professionals is available at https://www.bop.gov/resources/pdfs/covid19_vaccine_guidance_20210311.pdf. The latest information on BOP's vaccination efforts, including the number of completed vaccinations at each institution, is available at https://www.bop.gov/coronavirus/, and is updated every weekday.

5

**III.     Defendant's Conviction and Request for a Sentence Reduction**

Defendant was indicted after local authorities had twice arrested him with a firearm and drugs in a short period of time. On September 16, 2010, Defendant fled on foot from a traffic stop after admitting to smoking marijuana. He was apprehended and arrested after officers found a loaded handgun, marijuana and a digital scale in his vehicle.  He was released on bond and on February 9, 2011, Defendant led officers on a high-speed chase after the initiated a traffic stop on him. Officers once again found marijuana and a digital scale in Defendant's vehicle and during a search of Defendant's residence following his arrest, officers recovered a small amount of cocaine and an assault rifle with an extended magazine.

Defendant was ultimately allowed to plead guilty to only Count 1 of the Indictment, with the Government agreeing to dismiss the remaining counts.  Because of Defendant's prior criminal record (including a previous federal drug conspiracy conviction), he was determined to be an Armed Career Criminal and faced a mandatory minimum 180 month sentence.  The Court ultimately sentenced him to 188 months, at the bottom of his advisory guidelines range.

Defendant has served approximately 117 months of his sentence and his current projected release date is June 4, 2025.  Defendant does not have a disciplinary record during his current incarceration in BOP.

Prior to filing the instant motion, Defendant made a request for release to his warrant, which was denied.

**Legal Framework**

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment. Before filing that motion, however, the defendant must first request that BOP file such a motion on his or her behalf. § 3582(c)(1)(A). A court may grant the defendant's own motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed

"from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.[1]

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer,

---

[1] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
> (II) suffering from a serious functional or cognitive impairment, or
> (III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. USSG § 1B1.13, cmt. n.1(B)-(C). Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." USSG § 1B1.13, cmt. n.1(D).

In *United States v. McCoy*, 981 F.3d 271, 281–83 (4th Cir. 2020), the Fourth Circuit held the policy statement found in U.S.S.G. § 1B1.13—which applies to reductions in terms of imprisonment under § 3852(c)(1)(A)—does not apply to compassionate release motions *brought by inmates* under § 3582(c)(1)(A)(i). Under *McCoy*, because § 1B1.13 specifies its applicability only to motions brought by the Bureau of Prisons, it cannot be the policy statement applicable in circumstances where defendants bring their own motions for compassionate release. *Id*. In place of the no-longer-applicable policy statement, *McCoy* permits "courts [to] make their own independent determinations of what constitutes an 'extraordinary and compelling reason[ ]' under § 3582(c)(1)(A), as consistent with the statutory language[.]" *Id*. at 284.

As the court later explained in *United States v. High*, however, "§ 1B1.13, even though issued before Congress authorized defendant-filed motions, 'remains helpful guidance even when motions are filed by defendants.'" 997 F.3d 181, 186 (4th Cir. 2021) (quoting *McCoy*, 981 F.3d at 282 n.7). "Both before and after the change authorizing defendant-filed motions, § 3582(c) continues to describe the substantive ground the same – that a court may reduce a sentence if it finds that extraordinary and compelling reasons warrant such a reduction." *Id.* (internal alteration

8

and quotation marks omitted). And §1B1.13 "describes '*what should be considered* extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples.'" *Id.* (emphasis in original). Thus, *High* explained, although § 1B1.13 "is not applicable to *defendant-filed* motions under § 3582(c), it defines, in the medical context, the same substantive term that applies to *BOP-filed* motions. One might reasonably believe therefore that the term 'extraordinary and compelling reasons' will be defined the same for *defendant-filed* motions." *Id.* (emphasis in original).

## Arguments

This Court should deny the defendant's motion for a reduction in his sentence with prejudice on either of two independently sufficient grounds. First, the defendant has not established that "extraordinary and compelling reasons" support a sentence reduction; second, the defendant has not met his burden to show that a reduction is warranted in light of the danger that the defendant would pose to the community and the relevant § 3553(a) factors.

### A. The Court Should Deny The Motion Because the Defendant Has Failed to Present Any "Extraordinary and Compelling Reasons" Warranting a Sentence Reduction and Because He Poses a Danger to Public Safety.

This Court should deny Defendant's motion for two reasons. First, Defendant has not identified "extraordinary and compelling reasons" for that reduction within the meaning of § 3582(c)(1)(A). Second, the defendant poses a significant danger to the public and the statutory sentencing factors do not weigh in favor of his release.

#### 1. The Defendant Has Not Identified "Extraordinary and Compelling Reasons" for a Sentence Reduction.

The fact of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not alone provide a basis for a sentence reduction. The guideline policy statement describes specific serious medical conditions afflicting an individual inmate, not

9

generalized threats to the entire population. As the Third Circuit therefore held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).

The Government acknowledges, however, that an inmate who has not been offered a vaccine, who presents a risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19, and who is not expected to recover from that condition, presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I), as, due to his condition, the defendant may be less able to protect himself against an unfavorable outcome from the disease. *See United States v. Tartaglione*, 2020 WL 3969778, at *5–6 (E.D. Pa. July 14, 2020) ("a prisoner seeking release due to COVID-19 must at least show: (1) a sufficiently serious medical condition, or advanced age, placing the prisoner at a uniquely high risk of grave illness or death if infected by COVID-19; and (2) an actual, non-speculative risk of exposure to COVID-19 in the facility where the prisoner is held" (quoting *United States v. Somerville*, 463 F. Supp. 3d 585, 597 (W.D. Pa. 2020)); *see also United States v. Elias*, 984 F.3d 516, 521 (6th Cir. 2021) (affirming denial of compassionate release and observing that "the district court properly considered the CDC guidance that was in effect at the time . . . . Relying on official guidelines from the CDC is a common practice in assessing compassionate-release motions.").

The CDC's list of risk factors appears at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (accessed November 4, 2021). It reports a list of conditions that "can make you more likely to get severely ill from COVID-19."

An inmate who has not been offered a vaccine and presents a condition on that list presents an "extraordinary and compelling reason" allowing consideration of compassionate release.[2]

Here, the defendant presents the risk factors of kidney disease and mild obesity. However, he no longer presents an "extraordinary and compelling reason" that could warrant release because he was offered a vaccine and declined it. See Exhibit 2. The motion should therefore be denied.

As the Government has explained, the guideline policy statement treats as an "extraordinary and compelling" circumstance "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of

---

[2] Before March 29, 2021, the CDC presented two separate lists of conditions that either definitively entailed a greater risk of severe illness or "might" entail a greater risk of severe illness. Those "might" conditions were asthma (moderate-to-severe); cerebrovascular disease; cystic fibrosis; hypertension; immunocompromised state from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines; neurologic conditions, such as dementia; liver disease; overweight; pulmonary fibrosis; thalassemia; and type 1 diabetes mellitus. At that time, the Government maintained – and most courts agreed – that inmates with conditions on the "might" list did not present an extraordinary basis for relief. *See, e.g.*, *United States v. Durham*, 2020 WL 5577884, at *2 (W.D.N.C. Sept. 17, 2020); *United States v. Moldover*, 2020 WL 6731111, at *9 (E.D. Pa. Nov. 13, 2020) ("District courts have routinely denied motions for compassionate release based on allegations of only potential COVID-19 risk factors, including asthma and hypertension.").

In the March 29 revision, the CDC merged the two lists without extensive explanation. The CDC also presents a page with information for healthcare providers, which discusses the evidentiary basis for designating each risk factor and indicates that there remains less extensive support for drawing conclusions regarding most conditions formerly listed as "might" factors. *See* Centers for Disease Control and Prevention, "Underlying Medical Conditions," https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-care/underlyingconditions.html (accessed November 4, 2021). The Government nevertheless continues to follow CDC guidance and therefore relies on the CDC's expanded list to define what constitutes an "extraordinary and compelling" basis for consideration of compassionate release of an inmate who has not been offered a vaccine.

It also bears noting that although age is not listed as a separate risk factor, the CDC has emphasized that it is an important indicator of risk. The CDC page regarding risk factors states: "More than 80% of COVID-19 deaths occur in people over age 65, and more than 95% of COVID-19 deaths occur in people older than 45."

a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 app. note 1(A)(ii). During this pandemic, the Government has acknowledged that an unvaccinated inmate who presents a medical risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19, and who is not expected to recover from that condition, presents an extraordinary and compelling circumstance under that provision.

That circumstance now does not exist, as the available vaccines permit effective self-care against severe illness or death that may be caused by the coronavirus. The CDC has consistently and strongly advised that every person 12 years of age and older receive one of the vaccines that has received emergency use authorization from the FDA. The CDC states that the vaccines are "safe and effective," and "[g]etting vaccinated prevents severe illness, hospitalizations, and death." Centers for Disease Control and Prevention, "COVID-19 Risks and Vaccine Information for Older Adults," https://www.cdc.gov/aging/covid19/covid19-older-adults.html (accessed November 4, 2021).

The vaccines were the subject of extensive clinical trials before authorization, which revealed high effectiveness in preventing infection, severe illness, and death.  The data thus far show remarkable success in the real world.  The CDC reports that as of August 2, 2021, there are more than 164 million Americans who have been fully vaccinated. Within that group, only approximately 5,000 hospitalizations from symptomatic "breakthrough infections" have been reported and only approximately 1,200 deaths (0.00073%). Centers for Disease Control and Prevention, "COVID-19 Vaccine Breakthrough Case Investigation and Reporting," https://www.cdc.gov/vaccines/covid-19/health-departments/breakthrough-cases.html (accessed November 4, 2021). These data suggest a level of risk from COVID-19 of a vaccinated person is

far less than that faced by prisoners and all other persons from myriad other ailments and hazards of daily life.

There has been widespread recent reporting that the Delta variant of COVID-19 is now the most prevalent variant causing new infections in the United States, posing a significant risk to unvaccinated persons. The CDC reports, however, that the approved vaccines are proving highly effective against the Delta variant, stating, "FDA-authorized COVID-19 vaccines protect against Delta and other known variants." The CDC adds: "Infections happen in only a small proportion of people who are fully vaccinated, even with the Delta variant. Some breakthrough infections are expected, but remain rare. . . . All vaccines are particularly effective against severe illness, hospitalization and death."[3]

Accordingly, once a vaccine is available to an inmate, compassionate release is not warranted based on the threat of COVID-19 alone. *See United States v. Reed*, 2021 WL 2681498, at *4 (E.D. Pa. June 30, 2021) ("Now that COVID-19 vaccinations are being administered throughout the Bureau of Prisons, compassionate release motions [based on COVID-19] generally lack merit."). Courts have agreed with this conclusion almost unanimously and routinely deny relief to an inmate who has been vaccinated. *See, e.g.*, *United States v. Butler*, No. 4:17-cr-468-RBH, ECF No. 165 (D.S.C. Apr. 29, 2021) ("The combination of vaccinated inmates and staff, plus those who have recovered from a prior COIVD-19 infection, mitigates the risk of community

---

[3] Centers for Disease Control and Prevention, "What You Need to Know About Variants," https://www.cdc.gov/coronavirus/2019-ncov/variants/variant.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Ftransmission%2Fvariant.html (accessed November 4, 2021); *see also* Centers for Disease Control and Prevention, "Delta Variant: What We Know About the Science," https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (accessed November 4, 2021) ("Vaccines in the US are highly effective, including against the Delta variant.").

spread of the virus and reduces the risk to Defendant, even when one considers Defendant's alleged mental health conditions"); *United States v. Harris*, 2021 WL 1516012, at *2 (D. Md. Apr. 16, 2021) ("Clearly, there can be no bright-line rule that a vaccinated individual is no longer at compellingly elevated risk, but in most instances, the risk of complications is dramatically reduced. Thus, while anything is possible, there is no articulable reason to believe that Harris will be a non-responder or will have a different reaction to the vaccine than the vast majority of its recipients, who develop significant antibody protection to the virus. On the present record, then, this Court concludes that Harris's vaccination status removes his borderline obesity from the category of risk constituting an "extraordinary and compelling reason" to consider compassionate release."); *United States v. Grummer*, 2021 WL 568782, at *2 (S.D. Cal. Feb. 16, 2021) (denying compassionate release to defendant with several chronic medical conditions when defendant had been fully vaccinated against COVID-19); *United States v. Johnson*, 2021 WL 1550460, at *5 (D. Minn. Apr. 20, 2021) ("To the extent Johnson remains concerned about contracting COVID-19 after receiving the vaccine, the Court finds this fear entirely speculative and declines to grant release based on a generalized fear of reinfection."); *United States v. Wakefield*, 2021 WL 640690, at *3 (W.D.N.C. Feb. 18, 2021).

Likewise, courts routinely deny compassionate release to an inmate who declined a vaccination. The Seventh Circuit stated:

> [A] prisoner who remains at elevated risk because he has declined to be vaccinated cannot plausibly characterize that risk as an "extraordinary and compelling" justification for release. The risk is self-incurred. . . . The federal judiciary need not accept a prisoner's self-diagnosed skepticism about the COVID-19 vaccines as an adequate explanation for remaining unvaccinated, when the responsible agencies all deem vaccination safe and effective . . . . A prisoner who can show that he is unable to receive or benefit from a vaccine still may turn to this statute, but, for the vast majority of prisoners, the availability of a vaccine makes it impossible to conclude that the risk of COVID-19 is an "extraordinary and compelling" reason for immediate release.

*United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021); *United States v. Lohmeier*, 2021 WL 365773, at *2 (N.D. Ill. Feb. 3, 2021) ("[T]he Court would not be inclined to find compelling circumstances for reducing [the defendant's] sentence based on concern about the risk of severe health impairments should he again contract COVID-19 when he has declined to take all available precautions against infection—specifically, vaccination. . . In declining vaccination (twice), [the defendant] declined the opportunity to reduce his risk exposure to COVID-19 dramatically; he cannot reasonably expect that prolonging his risk by declining vaccination will be rewarded with a sentence reduction"); *United States v. McBride*, 2021 WL 354129, at *3 (W.D.N.C. Feb. 2, 2021) ("Despite Defendant's expressed concerns regarding his risk of exposure, his BOP medical records show that . . . he refused the [COVID-19] vaccination. Defendant's refusal to take preventative measures undermines his assertion that extraordinary and compelling reasons exist to warrant his release from prison").

It is possible that the scientific consensus may shift if, for example, the efficacy of the vaccines changes over time, or variants emerge that bypass the vaccines. The Government will address those issues as they arise. But at present, absent such a "shift in the scientific consensus, vaccination against COVID-19 would preclude the argument that a defendant's susceptibility to the disease is 'extraordinary and compelling' for purposes of § 3582(c)(1)(A)." *United States v. Smith*, 2021 WL 364636, at *2 (E.D. Mich. Feb. 3, 2021). *See also United States v. Hill*, 2021 WL 1807285, at *2 (N.D. Ohio May 5, 2021) ("[I]f such scientific evidence later materializes, nothing will prevent Hill from filing another motion for compassionate release."); *United States v. White*, 2021 WL 964050, at *2 (E.D. Mich. Mar. 15, 2021) ("Defendant is free to renew his motion should more information emerge suggesting that the Pfizer vaccine cannot protect him from new

imminent strains of COVID-19. However, at this time, the Court does not find extraordinary and compelling circumstances based on that speculation.").[4]

In sum, absent a significant change in the current scientific assessment regarding the efficacy of the vaccines, the advent of widespread vaccine availability should bring to an end the unprecedented period in which compassionate release has been available based on the threat of the virus. Instead, sentence reductions based on medical conditions once again should be limited to extraordinary conditions that are terminal or severely limit an inmate's ability to function in a correctional setting. *See, e.g.*, *United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) (relief is "rare" and "extraordinary"); *United States v. Lisi*, 440 F. Supp. 3d 246, 251 (S.D.N.Y. 2020) ("[A] defendant's medical condition must be one of substantial severity and irremediability."). At present, the defendant does not present any such condition.[5]

---

[4] As noted, the vaccines are proving effective against the now-prevalent Delta variant, and therefore courts continue to deny compassionate release motions based on the risk from COVID-19. *See, e.g.*, *United States v. Jackson*, 2021 WL 3417910, at *3 (E.D. Mich. Aug. 5, 2021) ("While it is true that new variants—particularly the Delta variant—are on the rise, the CDC states that '[c]urrent data suggest that COVID-19 vaccines authorized for use in the United States offer protection against most variants currently spreading in the United States.' Thus, Jackson could have mitigated his fear of COVID-19 variants by getting vaccinated. Accordingly, the Court will not grant Jackson release based on his alleged fear of variants."); *United States v. Long*, 2021 WL 3185600, at *5 (D.D.C. July 28, 2021) (citing sources reporting the effectiveness of the Pfizer vaccine against the Delta variant, and stating, "Because Mr. Long has received both doses of the Pfizer-BioNTech COVID-19 vaccine, the presence of the delta variant does not make his circumstances extraordinary and compelling."); *United States v. Ogunlana*, 2021 WL 3129327, at *2 (D. Md. July 23, 2021) (denying relief to defendant who declined vaccine; "The scientific evidence suggests that the available vaccines provide significant protection against complications from COVID-19 infection, even with the emergence and current prevalence of the 'Delta variant.'").

[5] The Government further recognizes that an individual who contracts COVID-19, even if protected against severe illness, may later suffer from "long-haul" symptoms. This is not a basis for compassionate release at this time. If an inmate who previously suffered from COVID-19 later develops "long-haul" symptoms, his condition may be assessed at that time.

For all of these reasons, the defendant has failed to establish an "extraordinary and compelling reason" for a sentence reduction under § 3582(c), and compassionate release is not warranted here.

### 2. The Defendant Still Poses a Significant Danger to the Safety of the Community, and the § 3553(a) Factors Strongly Weigh Against Release.

Alternatively, the defendant's request for a sentence reduction should be denied because he has failed to demonstrate that he is not a danger to the safety of the community or otherwise merits release under the § 3553(a) factors. *See United States v. Kibble*, 992 F.3d 326, 331 (4th Cir. 2021) ("a district court may not grant a sentence reduction under 18 U.S.C. § 3582(c)(1)(A) without 'considering the factors set forth in section 3553(a) to the extent that they are applicable'").

At present, the defendant's medical conditions continue to be appropriately managed at the facility, which is also engaged in strenuous efforts to protect inmates against the spread of COVID-19, vaccinate inmates and staff against COVID-19, and would act to treat any inmate who does contract COVID-19.

Defendant's request for a sentence reduction should be once again be denied because he has failed to demonstrate that he is not a danger to the safety of the community or otherwise merits release under the § 3553(a) factors. Under the applicable policy statement, this Court, even if "extraordinary and compelling" reasons for release exist, must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2). Additionally, this Court must consider the § 3553(a) factors, as "applicable," as part of its analysis. *See* § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020). Defendant would pose a danger to public safety if released. This Court should deny a sentence reduction on that basis alone.

As noted earlier, within a matter of a few months, Defendant was arrested twice for possession of firearms. On both occasions, Defendant fled from police (once on foot, once in a high-speed vehicle chase). This is not Defendant's first time being incarcerated in BOP. In 2000, he was sentenced to 79 months imprisonment to be followed by five years supervised release for conspiring to possess with intent to distribute cocaine base. He was released to supervision in October 2004 and by February 2015 he was arrested for possession with intent to distribute crack. This led to yet another conviction for a serious drug offense, as well as a two-year revocation of his federal supervised release.

He eventually completed his supervised release in September 2009. Just over a year after his release, he was arrested for the conduct that was charged in Count 1, running from police while leaving marijuana and a loaded handgun in his vehicle. Prior to going to federal prison the first time, Defendant had convictions for bringing a firearm to school, as well as possession with intent to distribute cocaine. He was on probation for that conviction at the time he was arrested in his first federal case.

Given Defendant's extensive criminal history, which includes a number of convictions for serious offenses, it is clear that he is a danger to the community when allowed to live in society. In addition, the § 3553(a) factors strongly disfavor a sentence reduction. Allowing Defendant to be released well before his sentence is set to expire would not reflect the seriousness of his crimes, promote respect for the law or provide just punishment, especially given his continued criminal conduct even when under supervision. Allowing Defendant to be released early would certainly not afford adequate deterrence to Defendant, nor would it deter other criminals. Nor would such an early release protect the public from future crimes of Defendant. His repeated criminal conduct shows that he has no concern for the safety of the public. Accordingly, in light of Defendant's

conduct and the totality of relevant circumstances, this Court should deny the motion for a sentence reduction.

Accordingly, in light of the defendant's record and the totality of relevant circumstances, this Court should deny the motion for a sentence reduction.

## Conclusion

For these reasons, this Court should deny the defendant's motion for a sentence reduction without prejudice for failure to exhaust administrative remedies or, in the alternative, deny the motion on the merits.

                                        Respectfully submitted,

                                        M. RHETT DEHART
                                        ACTING UNITED STATES ATTORNEY

                                        s/Nick Bianchi
                                        Nick Bianchi (ID # 10245)
                                        Assistant United States Attorney
                                        151 Meeting Street, Suite 200
                                        Charleston, SC 29401
                                        Tel. (843) 727-4381

November 5, 2021                        Email: nick.bianchi@usdoj.gov